UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAVID ULRICH,

                Plaintiff,

     -against-                              COMPLAINT AND
                                                    <u>JURY DEMAND</u>
JOHN O'KEEFE,

                                                     22 Civ. _____

                Defendant.
------------------------------------------------------------X

       Plaintiff David Ulrich, by his attorneys, Kraus & Zuchlewski LLP, as and for his Complaint, alleges as follows:

## **INTRODUCTION**

       1.     Plaintiff David Ulrich, an information technology professional and former President, Executive Vice President for Operations and Chief Operations Officer of ITelagen LLC, brings this action for breach of fiduciary duty against his former business partner and associate John O'Keefe for failing to carry out his fiduciary obligations of performing his duties of candor and loyalty to Mr. Ulrich. Mr. O'Keefe failed to provide Mr. Ulrich with critical information impacting his career regarding ITelagen's acquisition by another company and failed to exercise his duty of loyalty to Mr. Ulrich by not representing his interests in critical negotiations with the acquiring entity.

       When ITelagen, the company led by Mr. O'Keefe and Mr. Ulrich, considered the possibility of acquisition by another company known as Sheridan, Mr. O'Keefe engaged in discussions regarding his and Mr. Ulrich's professional futures. However, Mr. O'Keefe failed both to inform Mr. Ulrich of the content of these negotiations – which were crucial to Mr.

Ulrich's professional standing and prospects – or to advocate for his interests with Sheridan's principals.

As a consequence of Mr. O'Keefe's acts and omissions, Mr. Ulrich was offered a minimal severance package that provides him with scant transitional assistance until he obtains his next position. Based upon communications from Mr. O'Keefe, Mr. Ulrich understands that Mr. O'Keefe has received payments from Sheridan in excess of $350,000. Mr. O'Keefe has done nothing to remedy this breach of his fiduciary duty to Mr. Ulrich.

## JURISDICTION AND VENUE

2.  This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

3.  Venue is proper in this Court because Plaintiff is domiciled within this judicial district and a majority of the events related to Plaintiff's claims occurred within this district.

## THE PARTIES

4.  Mr. Ulrich is a United States citizen domiciled in New York, New York. He is a citizen of the state of New York.

5.  Mr. O'Keefe is the former Chief Executive Officer of ITelagen LLC. He is domiciled in Sarasota, Florida.

## FACTS

6.  In early 2006, Mr. Ulrich met with Mr. O'Keefe, the Chief Executive Officer of NetGenIT, regarding an employment opportunity with that start-up company. The company initially hired Mr. Ulrich as Sales Agent, and his employment agreement granted him 300,000 shares of NetGenIT common stock.

7. Mr. Ulrich excelled at his work, and in 2008 Mr. O'Keefe promoted him to the position of Chief Operating Officer.

8. Mr. Ulrich's promotion included an 18% ownership interest in the company, which at approximately that time was renamed ITelagen.

9. From that point on, Mr. Ulrich and Mr. O'Keefe were effectively partners. When describing the growth of ITelagen, Mr. O'Keefe commonly used the expression "when David and I started the company." During the period that ITelagen was a limited liability corporation, Mr. Ulrich and Mr. O'Keefe would sign documents as "Director" and "Managing Director," respectively. The two jointly made major decisions involving the company.

10. In approximately 2015, Mr. O'Keefe began searching for a new major investor who would be more willing to give ITelagen opportunities to grow than the company's prior main investor.

11. After an extensive search, ITelagen chose an investor called GBP Capital ("GBP") to assume this role. At the time, GBP appeared to be a legitimate, mainstream business.

12. Thereafter, however, it became apparent that GBP was a questionable, borderline enterprise. Mr. Ulrich and Mr. O'Keefe even began comparing it to a pyramid scheme.

13. For these and other reasons, Mr. O'Keefe and Mr. Ulrich decided that replacing GBP with another investor was in the company's best interests.

14. Mr. O'Keefe and the company's Chief Financial Officer conducted a search for a new investor, and the private equity firm Sheridan expressed interest in replacing GBP.

15. After discussions between the two companies, ITelagen and Sheridan reached a tentative agreement whereby Sheridan would purchase ITelagen outright.

16. Shortly before the acquisition deal was to close, the parties learned that law enforcement officials were about to take action against GBP's three principals.

17. Sheridan then indicated, presumably because of unease regarding ITelagen's association with a suspect enterprise, that it was withdrawing from negotiations with ITelagen.

18. Nonetheless, Mr. O'Keefe continued talking to Sheridan in an effort to persuade it that the ITelagen transaction was a viable one, should not be aborted because of events concerning GBP and that Sheridan should move forward with consummating the deal.

19. Mr. O'Keefe's efforts were ultimately successful and an agreement between ITelagen and Sheridan was reached.

20. Mr. O'Keefe initially advised Mr. Ulrich that Sheridan intended to keep ITelagen and its management staff intact and use it – at least short term – as a platform for future investments in healthcare information technology prospects. At that time, Mr. Ulrich was serving as Executive Vice President of ITelagen.

21. Mr. O'Keefe further informed Mr. Ulrich that he, but not Mr. Ulrich, would be given an employment contract with Sheridan.

22. This development concerned and surprised Mr. Ulrich, who had assumed that his partner Mr. O'Keefe, who had been conducting the Sheridan negotiations, would look after his interests.

23. At about the same time, however, Mr. O'Keefe also asserted that Sheridan had required him to agree to a severance package as a condition for final closing of the deal.

24. Mr. O'Keefe neither disclosed the terms of his severance arrangement to Mr. Ulrich nor did he seek to obtain a similar severance arrangement for Mr. Ulrich.

25. On March 26, 2021, the acquisition transaction deal with Sheridan closed.

26. Two weeks later, on April 7, Sheridan's senior managers advised Mr. O'Keefe that employment of both he and Mr. Ulrich was to be terminated. Mr. Ulrich received an email from several Sheridan principals offering him three months of severance.

27. Soon thereafter, post-termination discussions with Sheridan involving the details of Mr. O'Keefe's and Mr. Ulrich's dismissals took place.

28. Mr. O'Keefe negotiated on behalf of ITelagen with Sheridan.

29. During his negotiations with Sheridan, Mr. O'Keefe did not inform Mr. Ulrich of the progress or content of the discussions.

30. As part of the agreement that Mr. O'Keefe then reached with Sheridan, he was given three months of continued employment.

31. Upon information and belief, Sheridan promised Mr. O'Keefe at least one year of severance.

32. The agreement Mr. Keefe reached with Sheridan, however, gave Mr. Ulrich nothing beyond the three months severance suggested to him earlier.

33. This arrangement was identical to the one offered to ITelagen's recently hired Sales Manager, who not only had failed to close any sales but also had harassed one of the company's female employees.

34. Moreover, because he signed an agreement and release with Sheridan, Mr. O'Keefe was not in a position to take legal or other action against Sheridan based on its deliberate misrepresentation that ITelagen's senior management would have a role to play in Sheridan going forward after the acquisition.

35. Mr. Ulrich, disturbed by Mr. O'Keefe's failure to advance or effectively represent his interests in his discussions with Sheridan, declined to sign a separation agreement promising

him only three months of severance – apparently a fraction of what Mr. O'Keefe had negotiated for himself.

36. Perhaps uneasy about his failure to act in the best interests of Mr. Ulrich, Mr. O'Keefe offered him a $50,000 payment in exchange for signing the separation package proposed to him by Sheridan.

37. Mr. Ulrich, viewing this offer as an inducement to accept a grossly inadequate separation deal absolving Mr. O'Keefe of any liability, did not accept the offer.

38. Because Mr. Ulrich was Mr. O'Keefe's business partner or, at a minimum, his business associate, a fiduciary relationship existed between the two men.

39. Their fiduciary relationship involved not only a special trust between Mr. Ulrich and Mr. O'Keefe, but also Mr. O'Keefe's obligation to act with the best intentions with regard to Mr. Ulrich.

40. Mr. Ulrich relied on Mr. O'Keefe, as the fiduciary in which he had placed his trust, to demonstrate the utmost good faith and undivided loyalty in representing Mr. Ulrich's interests in his negotiations with Sheridan.

41. Mr. O'Keefe's conduct in failing to seek an acceptable separation arrangement for Mr. Ulrich in his discussions with Sheridan represented misconduct and a clear failure to act on the basis of the trust Mr. Ulrich had placed in him.

42. Mr. O'Keefe breached his duty of care, duty of candor and particularly his duty of loyalty to Mr. Ulrich by failing to act in his best interests.

43. As a result, Mr. Ulrich has suffered significant financial injury as well as harm to his career and professional reputation.

## AS AND FOR A CAUSE OF ACTION

## Breach of Fiduciary Duty

44. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 43 inclusive as though fully set forth herein.

45. Mr. O'Keefe owed a fiduciary duty to Mr. Ulrich, his business partner and associate, based on the relationship between the parties as well as agreements between them.

46. As such, Mr. O'Keefe was required to be completely honest, forthcoming and truthful to Mr. Ulrich and to act in good faith and in his best interests.

47. Mr. O'Keefe breached his fiduciary duty to Mr. Ulrich by both failing to provide him with timely and accurate information about Sheridan's acquisition of ITelagen and by placing his own interests above Mr. Ulrich's by negotiating a favorable separation arrangement for himself while making little or no effort to ensure an adequate separation agreement for Mr. Ulrich.

48. As a direct result of Mr. O'Keefe's failure to disclose all pertinent information regarding the Sheridan acquisition and the negotiations preceding it to Mr. Ulrich, and to act in accord with his best interests in making agreements with Sheridan, Mr. Ulrich suffered damages both financially and to his professional stature.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts.

**WHEREFORE,** Mr. Ulrich respectfully prays that this Court:

49. Issue a judgment declaring that O'Keefe's actions violated Plaintiff's rights under the fiduciary duty doctrine.

50. Ordering that Mr. O'Keefe pay Mr. Ulrich:

      a.      A sum commensurate with the damages he suffered as a result of Mr. O'Keefe's breach of his fiduciary obligations;

      b.      Other and further relief as may be just and proper.

Dated: New York, New York
         January 7, 2022

                                      KRAUS & ZUCHLEWSKI LLP
                                      Attorneys for Plaintiff
                                      60 E. 42nd Street, Ste. 2534
                                      New York, New York 10165

                By:    */s/ Geoffrey Mort*
                          Geoffrey Mort (GM5254)